UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 19 CR 329 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| JEROME WATSON, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

A grand jury charged Jerome Watson with knowingly possessing a firearm after having

been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). Doc. 1. Watson moves to

suppress evidence that that he possessed the firearm. Docs. 67, 105. Pursuant to Criminal Rule

12(d), the court states its findings of fact and conclusions of law. Watson's motion is denied in

part and denied without prejudice as moot in part.

**Findings of Fact**

After hearing live testimony from Chicago police officer Jose Rivera and police

dispatcher Cassandra Davis, and after reviewing the parties' evidentiary submissions and

arguments, the court finds the following facts.

A.     **The 911 Calls**

At about 12:28 p.m. on December 25, 2018, a woman placed an anonymous 911 call to

report that four men were selling drugs on the 6600 block of South Kenwood Avenue in

Chicago. 6/3/2021 Tr. at 73; Gov't Exh. 7 (OEMC Event Query 1) at 1; Gov't Exh. 8 (OEMC

Summary 1) at 1. (The Government's exhibits are numbered in the order in which they appear

on its exhibit list.) That block of Kenwood Avenue is in a high-crime area, and it was not

unusual for the police to receive reports of drug dealing there. 6/3/2021 Tr. at 7-8; Gov't

Exh. 11. At about 1:06 p.m., the 911 report was relayed to a team of four plainclothes police officers on patrol in an unmarked car: Sergeant White, Officer Ballesteros, Officer Rivera, and Officer Sieber. 6/3/2021 Tr. at 5-6, 9; Gov't Exh. 7 at 1; Gov't Exh. 8 at 1. The officers eventually reported back to dispatch that they had not found anything, and the matter was closed. 6/3/2021 Tr. at 70-71; Gov't Exh. 7 at 1-2; Gov't Exh. 8 at 1. The officers later admitted, however, that they had never actually gone to the scene. 6/3/2021 Tr. at 30-34.

At about 1:17 p.m., the same woman placed another anonymous 911 call. *Id*. at 73; Gov't Exh. 4 (911 Call) at 0:00-:10, 1:07-:11; Gov't Exh. 10 at 1. As in her earlier call, she reported that men were dealing drugs near an empty lot by a liquor store at around 6640 South Kenwood Avenue. Gov't Exh. 4 at 0:10-:28. She stated that she had called the police "about an hour and a half ago" to report the same activity, and that the police came, the men left, and "they all came right back." *Id*. at 0:10-:16. She noted that there were six Black men in their 30s "out there" drinking and throwing their empty liquor bottles. *Id*. at 0:29-:42. She added that "cars keep coming up to" the men, one of whom had a blue Hyundai that had been "sitting there" for two or three hours. *Id*. at 0:43-:54. When asked where the men kept the drugs, the woman did not give any detail, stating that the drugs were "just on them." *Id*. at 0:54-1:00. She also said that she was "calling every day until this gets resolved" because she had witnessed someone snort crack right in front of her house the day before. *Id*. at 1:00-:06.

That second 911 report was dispatched to the same team of officers. 6/3/2021 Tr. at 8-9. The officers were told that there were six Black men in their 30s drinking, smoking, and selling drugs in front of a building, that the drugs may be on the men, and that one of them had a blue Hyundai parked nearby. *Id*. at 9; Gov't Exh. 10 at 2.

### B.     The Stop

At approximately 1:40 p.m., the four officers—White, Ballesteros, Rivera, and Sieber—arrived near the empty lot on South Kenwood and parked slightly behind and to the right of a blue Hyundai.  6/3/2021 Tr. at 9-10; Gov't Exh. 2 (Sieber BWC Video) at 0:28-:32.  Nobody was on the street, and the officers did not observe any drinking, smoking, or selling drugs. 6/3/2021 Tr. at 36-38.

Inside the Hyundai were three Black men, including Watson, who at the time was 33 years old.  *Id*. at 10; Gov't Exh. 2 at 0:38-1:00; Gov't Exh. 3 (White BWC Video) at 0:00-:10. Officer Sieber approached the front driver-side window, and Officer Ballesteros approached the front passenger-side window.  Gov't Exh. 2 at 0:32-:39; Gov't Exh. 3 at 0:00-:03.  While those windows were being rolled down, Officer Rivera walked toward the car and yelled, "Everybody out!"  Gov't Exh. 2 at 0:39-:43.  The three men exited the car.  *Id*. at 0:46-1:03.

Officer Rivera testified that when he was approaching the Hyundai, he detected a "strong odor" of marijuana coming from inside.  6/3/2021 Tr. at 11-12.  A small baggie of marijuana was later recovered from one of Watson's companions.  *Id*. at 23-24, 46.  Still, the court does not find Rivera's testimony credible on this specific point, given that: (1) some officers were closer to the car at the time Rivera said he smelled the marijuana, Gov't Exh. 2 at 0:36-:44, yet no officer mentioned smelling marijuana at any time during the stop, 6/3/2021 Tr. at 45-46; (2) there was no mention of marijuana in the arrest report, Gov't Exh. 6 (Watson arrest report); and (3) the Government did not call any of the other officers at the evidentiary hearing to corroborate Rivera's account of a noticeable marijuana smell.  Because the court finds that Rivera's testimony is not credible in this respect, it places far more evidentiary weight on the footage from the officers' body-worn cameras than on Rivera's testimony.

Officer Rivera confronted Watson, who had exited the Hyundai from the rear driver-side door. Gov't Exh. 2 at 0:52-:56; Gov't Exh. 3 at 0:05-:11. (Rivera did not turn on his body-worn camera at this point, and switched it on only after discovering the gun in Watson's waistband. 6/3/2021 Tr. at 19, 28; Gov't Exh. 1 (Rivera BWC Video) at 0:00.) Rivera instructed Watson to place his phone on top of the Hyundai and asked if he had any identification. 6/3/2021 Tr. at 48-49; Gov't Exh. 2 at 0:56-1:05. Watson immediately reached for his wallet, which was in his right pants pocket. 6/3/2021 Tr. at 49; Gov't Exh. 3 at 0:22-:24. Rivera grabbed Watson's arm and prevented him from reaching into his pocket. 6/3/2021 Tr. at 13; Gov't Exh. 3 at 0:24-:28. Rivera then performed a brief pat-down of Watson's sides, and found nothing. 6/3/2021 Tr. at 13-16; Gov't Exh. 3 at 0:28-:33. Eventually, Rivera reached into Watson's right pocket, pulled out his wallet, and handed it to him, and Watson took out his driver's license and gave it to Rivera. 6/3/2021 Tr. at 48-49; Gov't Ex. 2 at 1:31-:45; Gov't Exh. 3 at 0:43-1:04.

After looking at Watson's driver's license, Officer Rivera commented, "Mr. Watson, how long you been visiting, 'cause I stopped you last week." 6/3/2021 Tr. at 50; Gov't Ex. 2 at 1:45-:49; Gov't Exh. 3 at 1:01-:04. Rivera then handed the license to Officer Sieber, who took it back to the officers' vehicle to run a check on it. Gov't Ex. 2 at 1:48-2:04. At that point, about 90 seconds had elapsed since the four officers exited their vehicle. *Compare id*. at 0:31 (officers exiting their vehicle), *with id*. at 2:01 (Sieber entering the vehicle).

Officer Sieber ran a check on Watson's license, which turned up an order of protection against him. *Id*. at 2:01-:05, 3:47-:50. The license check process took about a minute and a half, so when Sieber exited the police vehicle to return to the Hyundai, a little over three minutes had elapsed since the beginning of the encounter. *Compare id*. at 3:35 (Sieber exiting the police vehicle after running the license check), *with id*. at 0:31 (the officers exiting the police vehicle at

4

the beginning of the stop), *and id*. at 2:01 (Sieber entering the police vehicle to run the license check).

While Officer Sieber was in the police vehicle running the check on Watson's license, Officer Rivera was standing with Watson. 6/3/2021 Tr. at 16-17; Gov't Exh. 3 at 1:05-:10, 2:18-:20. Rivera cuffed Watson to one of the other men, and Rivera and other officers searched the Hyundai. 6/3/2021 Tr. at 16-17; Gov't Exh. 3 at 1:20-2:20. After the search, which turned up nothing, Rivera noticed Watson making furtive, "fidgety" movements, pressing his body up against the Hyundai in a strange way as if to conceal something. 6/3/2021 Tr. at 16-17, 22-23; *see* Gov't Exh. 1 at 6:45-7:01. Because his first pat-down of Watson was cursory and limited to Watson's sides, Rivera thought that Watson might have a gun on him after all. 6/3/2021 Tr. at 17-18, 23. So Rivera performed a second pat-down, this time of Watson's entire waist area. *Id*. at 18; Gov't Exh. 1 at 0:00-:12. Rivera felt "the butt of a handgun" in the front of Watson's waistband, 6/3/2021 Tr. at 18, and lifted Watson's shirt and discovered a gun, Gov't Exh. 1 at 0:05-:10. Rivera seized the gun and placed Watson under arrest. 6/3/2021 Tr. at 6-7; Gov't Exh. 1 at 0:08-:48.

Officer Sieber returned from running the check on Watson's license just seconds before Officer Rivera discovered the gun on Watson's person, and by the time Sieber placed the license back in Watson's wallet, the gun had already been found. Gov't Exh. 1 at 0:13-:16; Gov't Exh. 2 at 3:40-4:09; Gov't Exh. 3 at 2:56-3:24.

### Conclusions of Law

Watson's motion makes two general arguments: (1) evidence of the gun must be suppressed because its discovery occurred after the officers violated his Fourth Amendment rights, Doc. 67 at 8-9; Doc. 105 at 9-14; and (2) certain post-arrest statements Watson made to

law enforcement about the gun must be suppressed under *Miranda v. Arizona*, 384 U.S. 436 (1966), Doc. 67 at 9-10; Doc. 105 at 14.  The Government has forsworn reliance on those post-arrest statements, 6/3/2021 Tr. at 2, so Watson's motion is denied without prejudice as moot as to his *Miranda* claim.

As to the discovery of the gun, Watson contends that the officers' conduct was constitutionally infirm in four respects.  First, he argues that the officers lacked the reasonable suspicion necessary to support his seizure.  Doc. 105 at 11-12.  Second, he argues that the officers' show of force rendered the seizure an arrest, one that in his view was unlawful because it lacked probable cause.  *Id*. at 9-10.  Third, he argues that there was no basis for Officer Rivera's second pat-down—the one that turned up the gun.  *Id*. at 12-14.  And fourth, he argues that by the time Rivera discovered the gun, the stop had already been prolonged beyond what was reasonable.  Doc. 124 at 8-9.  Watson's arguments are addressed in turn.

## I.     The Anonymous 911 Calls and Reasonable Suspicion

Watson argues that the second 911 call did not give rise to the reasonable suspicion necessary to support the officers' investigatory stop of the Hyundai and its passengers.  Doc. 105 at 11-12.  The reason, Watson contends, is that the anonymous caller: (1) "failed to provide a description of the individuals associated with the Hyundai"; (2) "failed to describe the occupants of the Hyundai"; (3) "failed to offer any observations that the individuals in the Hyundai were committing a crime"; and (4) "failed to offer details which the officers could corroborate through surveillance, except that the blue Hyundai existed and was located near what the caller believed was drug dealing."  *Id*. at 11.  Watson also faults the officers for not conducting additional surveillance before stopping him and his companions, arguing that what the officers observed upon arriving at the scene did not corroborate the information relayed by the anonymous 911 caller.  *Id*. at 11-12.

Police officers may conduct an investigatory stop—or a "*Terry* stop," *see Terry v. Ohio*, 392 U.S. 1 (1968)—of an individual if they "'have a reasonable suspicion, grounded in specific and articulable facts' that [the] individual has committed a felony or is about to commit a crime." *United States v. Lopez*, 907 F.3d 472, 478 (7th Cir. 2018) (quoting *United States v. Hensley*, 469 U.S. 221, 229 (1985)); *see also United States v. Rodriguez-Escalera*, 884 F.3d 661, 668 (7th Cir. 2018) ("To meet the reasonable-suspicion requirement, an officer must have 'a particularized and objective basis' for suspecting the persons detained of breaking the law.") (quoting *Heien v. North Carolina*, 574 U.S. 54, 60 (2014)). The reasonable suspicion standard is "less than probable cause," which is necessary for an arrest, and "considerably less than preponderance of the evidence," *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011) (internal quotation marks omitted), but "requires more than an 'inchoate and unparticularized suspicion or "hunch,"'" *United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). Reasonable suspicion "is an objective standard, considering the totality of the circumstances." *United States v. Lewis*, 920 F.3d 483, 493 (7th Cir. 2019); *see also United States v. Richmond*, 924 F.3d 404, 411 (7th Cir. 2019) ("When making reasonable suspicion determinations, [a court] 'must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.'") (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). When a defendant challenges the validity of a *Terry* stop, the Government bears the burden of showing that the officers had reasonable suspicion. *See United States v. Uribe*, 709 F.3d 646, 650 (7th Cir. 2013).

The question here is whether the anonymous 911 call, combined with the officers' observations upon arriving on the scene, supported a *Terry* stop of Watson. "Because

anonymous tips relayed to a police officer 'seldom demonstrate[] the informant's basis of knowledge or veracity,' they alone usually are not reliable enough to establish reasonable suspicion." *United States v. Watson*, 900 F.3d 892, 895 (7th Cir. 2018) (Barrett, J.) (alteration in original) (quoting *Florida v. J.L.*, 529 U.S. 266, 270 (2000)). The Supreme Court has identified "three factors that make an anonymous tip reliable enough to create reasonable suspicion: the tipster (1) asserts eyewitness knowledge of the reported event; (2) reports contemporaneously with the event; and (3) uses the 911 emergency system, which permits call tracing." *Ibid.* (citing *Prado Navarette v. California*, 572 U.S. 393, 398-401 (2014)).

All three factors are present here. The anonymous 911 caller reported witnessing six men dealing drugs, and her report suggested that the conduct was ongoing. And she not only called 911 to report her observations, but added that she had called earlier and would continue calling, thus rendering it less likely that she was making a false report. *See Prado Navarette*, 572 U.S. at 400 ("A 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity."); *cf. Watson*, 900 F.3d at 895 (distinguishing *Prado Navarette* on the ground that "the caller borrowed a stranger's phone, limiting the usefulness of the system's tracing ability," making it "not obvious that the … caller would be worried about getting caught providing false information and therefore 'think twice' before doing it") (quoting *Prado Navarette*, 572 U.S. at 401).

Granted, sometimes an officer responding to an anonymous 911 call might find a scene that differs so much from the caller's report that the officer will lack reasonable suspicion. *See Watson*, 900 F.3d at 896 (noting that reasonable suspicion "should have dissipated" when an officer responding to an anonymous 911 call "arrived at the scene" and "[w]hat he saw did not match the caller's report"). And sometimes the 911 report, while accurate as far as it goes, might

not justify a *Terry* stop because it does not support an inference of criminal behavior. *See Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010) (holding that an officer "acting solely upon a general report of a 'suspicious person'" lacked reasonable suspicion because nothing in the report "provide[d] any articulable facts that would suggest the person was committing a crime or was armed"); *United States v. Packer*, 15 F.3d 654, 659 (7th Cir. 1994) ("[A]lthough the caller's description of the vehicle and its location was corroborated by police observation, the police lacked the minimal detail of information that would point to any arguably particularized suspicion of criminal conduct.").

But here there was a concrete allegation of criminal activity: the 911 caller said that she was witnessing six men dealing drugs at a particular location. Given that specific report and what the officers found at the scene, they had reasonable suspicion that justified an investigatory stop of the Hyundai and the men inside. The caller reported that there were six Black men and that one of them had a blue Hyundai, and the officers arrived and found a blue Hyundai with three Black men inside. Granted, the caller had reported six men, not three, and there were no immediately obvious signs of drug dealing. But more than twenty minutes had elapsed since the call, so the fact that only three men were present was not such a glaring inconsistency with the caller's report that it negated reasonable suspicion—it would have been reasonable for an officer to infer that the three other men left in the interim and that the three remaining men had exhausted their supply of drugs. In short, the 911 call created reasonable suspicion that there were men with a blue Hyundai dealing drugs near 6640 South Kenwood, and nothing the officers observed at the scene ought to have dispelled that suspicion.

This conclusion finds support in *United States v. Williams*, 731 F.3d 678 (7th Cir. 2013), where the difference between the anonymous 911 caller's report and what police found at the

scene was far greater than it was here. The caller in *Williams* reported seeing about 25 people "being loud while loitering in [a] parking lot," "three or four of whom she had observed with 'guns out.'" *Id*. at 681. But when officers arrived less than five minutes later, they "observed a much different scene than that reported by the anonymous caller," specifically, eight to ten individuals standing peacefully, not 25 "belligerent[s]" with guns drawn. *Ibid*. Still, the Seventh Circuit held that the 911 call—in addition to the fact that, as here, the events occurred in a high-crime area—supported a *Terry* stop of the individuals in the parking lot. *Id*. at 684; *see also United States v. Wooden*, 551 F.3d 647 (7th Cir. 2008) (approving of not only a *Terry* stop, but also a frisk, despite a mismatch between the anonymous 911 caller's report and the situation the officer found on arrival). If a *Terry* stop was proper in *Williams*, it surely was proper here.

Watson makes much of the fact that the 911 caller did not clearly connect the drug dealing she witnessed with the men *inside* the blue Hyundai. Doc. 105 at 11. True enough, all the caller reported was that one of the men *had* a blue Hyundai. But that is hardly the type of discrepancy that defeats reasonable suspicion. The caller reported that there were men with a blue Hyundai at a particular location selling drugs. The officers observed a blue Hyundai at that location, with three men inside fitting the caller's description. That observation was more corroborative than contradictory of the 911 caller's report.

Watson also contends that the officers should have conducted additional surveillance upon their arrival at the scene to see whether the 911 call would be further corroborated, rather than immediately perform an investigatory stop of the men in the Hyundai. Doc. 105 at 11-12; 6/21/2021 Tr. at 3-4. But Watson offers no authority for the proposition that an officer who *already* has reasonable suspicion must, under certain circumstances, delay a *Terry* stop to see whether *additional* facts might emerge that would negate his suspicion. To the contrary, once an

10

officer has sufficient justification for a seizure, no further investigation or surveillance is required. *See Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011) (holding that officers "need not conduct additional investigation once they have established probable cause"); *cf. Watson*, 900 F.3d at 898 (suggesting that when an anonymous tip is *insufficient* to establish reasonable suspicion, the officers can "make their own observations about the developing situation, which could transform [the] innocuous tip into reasonable suspicion").

## II.     The Seizure and Probable Cause

Watson argues that he was "seized for purposes of the [F]ourth [A]mendment" when the four officers surrounded the Hyundai and ordered him and his companions out of the car, and that the seizure required probable cause. Doc. 105 at 9. That argument is incorrect, for while an arrest requires probable cause, the seizure of the Hyundai and its occupants was not an arrest, but a *Terry* stop. A *Terry* stop is a seizure short of an arrest and requires something less than probable cause—namely, reasonable articulable suspicion of criminal activity. *See United States v. Boden*, 854 F.2d 983, 992 (7th Cir. 1988) ("[B]ecause [a *Terry* stop] is a lesser restriction on freedom of movement than an arrest, [it] is allowed on a lesser showing of cause.") (first and third alterations in original) (internal quotation marks omitted). As explained above, the officers had reasonable suspicion to effectuate the seizure.

Perhaps Watson means to argue that the way the officers conducted the *Terry* stop transformed it into a full-blown arrest requiring probable cause. On that point, Watson asserts that "[o]fficers cannot simply surround a parked vehicle, order the occupants out of the car, handcuff them, search them and confiscate their identifications … absent probable cause that a crime has been committed." Doc. 105 at 11. But he provides no authority for this assertion, and governing precedent suggests that officers can take each of those steps without probable cause.

11

As Watson himself acknowledges, *id.* at 10-11, officers conducting a *Terry* stop may order the occupants to exit a vehicle.  *See United States v. Hendricks*, 319 F.3d 993, 1004 (7th Cir. 2003) (holding that an officer conducting a *Terry* stop may "take reasonable steps to insure [his] own safety," including "order[ing] the detainee to exit [a] vehicle") (internal quotation marks omitted); *United States v. Rivers*, 121 F.3d 1043, 1045 (7th Cir. 1997) ("The Supreme Court [has] ruled that police officers may ask passengers to step out of a vehicle during a *Terry* stop.") (citing *Maryland v. Wilson*, 519 U.S. 408, 414-15 (1997)).  The Seventh Circuit has also held that, while the practice should not become commonplace, handcuffing a detained person does not automatically convert a *Terry* stop into a full-blown arrest.  *See Matz v. Klotka*, 769 F.3d 517, 526 (7th Cir. 2014) ("Although the hallmarks of formal arrest such as applying handcuffs, drawing weapons, and placing suspects in police vehicles should not be the norm during an investigatory detention, all of those measures have been recognized as appropriate in certain circumstances.").  Specifically, the Seventh Circuit has held that when officers reasonably believe that a suspect is "potentially dangerous," the use of handcuffs does not "transform … a temporary detention into an arrest."  *United States v. Stewart*, 388 F.3d 1079, 1085 (7th Cir. 2004).

Here, the officers reasonably believed that Watson and his companions were "potentially dangerous," such that the *Terry* stop did not ripen into an arrest.  There were two reports suggesting that the men were dealing drugs, so the officers could reasonably fear that without restraining them in some manner, there was a risk of flight and/or to officer safety.  And as discussed at greater length below, the confiscation of Watson's identification was a lawful incident to the *Terry* stop, and the "search" of his person was the lawful result of his furtive movements.  So, in sum, nothing that occurred prior to Officer Rivera's discovery of the gun in

Watson's waistband turned the encounter into an arrest, and there was therefore no need for probable cause.

## III.    The Pat-Downs

That the stop of Watson was valid does not necessarily mean that Officer Rivera's pat-down was valid.  "A frisk—a limited pat down of the suspect's outer clothing to search for weapons—is permissible under the Fourth Amendment only if a police officer can 'point to specific and articulable facts' indicating 'that criminal activity may be afoot *and* that the persons with whom he is dealing may be armed and presently dangerous.'"  *United States v. Howell*, 958 F.3d 589, 598 (7th Cir. 2020) (emphasis added) (quoting *Terry*, 392 U.S. at 21, 24-25, 30); *see also Williams*, 731 F.3d at 678 ("[G]iven the more burdensome intrusion of a frisk, such action should only be allowed when the officer can point to articulable facts that would establish the separate and specific condition that the detainee has a weapon or poses some danger.  In other words, an officer performing a *Terry* stop may not automatically frisk the individual subject to the stop; rather, to do so, the officer must have some articulable suspicion that the subject is 'armed and dangerous.'") (citation omitted) (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).

Watson may be right that there was no basis for Officer Rivera's *first* pat-down, which was a brief frisk of his sides.  Rivera testified that he feared that Watson's sudden move for his right hip area suggested he may have a weapon.  6/3/2021 Tr. at 13-14.  Yet Watson reached toward his right pocket only after Rivera asked him if he had identification, which is what one might expect somebody in Watson's position to do.  At that moment, then, it is open to question whether Rivera had reasonable, articulable suspicion that Watson was armed.

But the validity of that first pat-down is neither here nor there, since it was the second pat-down that led to Officer Rivera's discovery of the gun on Watson's person.  And Watson

provides no reason why the arguable invalidity of the first pat-down taints the second pat-down. The result of the first pat-down—that Watson did not appear to have a gun in his hip areas—certainly added to the mix of information available to Rivera. So perhaps if Rivera had performed a more thorough pat-down the first time around and not found a gun, that would have negated any suspicious observations later in the encounter, as it would have strongly suggested that Watson was unarmed. But that is not what happened here. Rather, the initial pat-down was cursory and only of Watson's sides, not his entire waist area. Indeed, Rivera testified that it was probably an insufficient pat-down. *Id*. at 18. So the first pat-down can be ignored in deciding whether the second pat-down was constitutionally valid, aside from the fact that Rivera ought to have known that Watson did not have a weapon around his sides.

Officer Rivera was fully justified in performing the second, more thorough pat-down. Rivera testified that he observed Watson leaning up against the Hyundai in a manner suggesting that he was trying to hide something in his waist area. The court did not find Rivera to be credible when testifying about the odor of marijuana, but his testimony about Watson's furtive movements is credible, and in fact is corroborated by a comment by Watson caught on Officer Sieber's bodycam video after Rivera found the gun. Specifically, Watson told one of his companions that because of the way he was contorting his stance, the officers' cameras would not have captured something he was hiding on his body. Gov't Exh. 2 at 6:28-:33. Although Rivera did not hear Watson's comment at the time, 6/3/2021 Tr. at 49-50, the comment corroborates his testimony that he observed Watson making unusual movements to try to hide something on his body from the officers' view.

Given these circumstances, Officer Rivera's observation of Watson's physical movements supported a frisk of his waist area. Watson had been stopped after fitting the

description of a person reported to be engaged in drug dealing, and he was apparently trying to hide from the officers something in his midsection. A reasonable officer in Rivera's position would easily have reasonable suspicion that Watson might have a gun. *See United States v. Adair*, 925 F.3d 931, 937 (7th Cir. 2019) ("In the course of an authorized investigatory stop, an officer may proceed to conduct a protective pat down when confronting facts and circumstances giving rise to a reasonable suspicion that the individual has a weapon and otherwise poses a danger."); *United States v. Ford*, 872 F.3d 412, 414-15 (7th Cir. 2017) ("A police officer conducting an investigatory stop may frisk the suspect for weapons if the officer has an objectively reasonable suspicion that the suspect might be armed. Certainty about the presence of a weapon is unnecessary; 'the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'") (citations omitted) (quoting *Terry*, 392 U.S. at 27).

## IV. The Length of the Stop

The last question is whether the officers impermissibly extended the stop, such that by the time Officer Rivera found the gun in Watson's waistband, the detention had gone on for too long and thereby violated the Fourth Amendment. Just because a stop is "lawful at its inception" does not mean it remains lawful for the duration. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). In particular, an investigatory stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of the stop. *Ibid.*; *see also Rodriguez v. United States*, 135 S. Ct. 1609, 1614-15 (2015) (explaining that in a *Terry* stop, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission,'" and that "[a]uthority for the seizure thus ends when tasks tied to the [mission] are—or reasonably should have been—completed") (quoting *Caballes*, 543 U.S. at 407); *Johnson*, 555 U.S. at 333 ("An officer's inquiries into matters unrelated to the justification for the … stop, this Court has made

15

plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."); *United States v. Lewis*, 920 F.3d 483, 491 (7th Cir. 2019) ("[A] stop justified only by a traffic violation becomes unlawful if it is prolonged beyond the time reasonably required to complete the stop's original mission.").

Here, the officers prolonged the *Terry* stop by searching the Hyundai and running a check on Watson's driver's license. But the search of the Hyundai and the check of Watson's identification occurred simultaneously, so even if the vehicular search was invalid for lack of probable cause, *see United States v. Kizart*, 967 F.3d 693, 695 (7th Cir. 2020) ("[T]he automobile exception … allows authorities to search a car without a warrant if they have probable cause."), the stop was not improperly extended because the license check was permitted as incident to the stop.

In *Hall v. City of Chicago*, 953 F.3d 945 (7th Cir. 2020), the Seventh Circuit held that because officer safety "'is just as strongly implicated where the individual being detained for a short period of time is on foot, rather than in an automobile,' … an officer's completion of a warrant check during a street stop where the officer has reasonable suspicion of criminal activity is not *per se* unreasonable under the Fourth Amendment." *Id*. at 953 (quoting *United States v. Villagrana-Flores*, 467 F.3d 1269, 1277 (10th Cir. 2006)). The reasonableness of a warrant check, the Seventh Circuit explained, turns on the extent to which it extends the stop. *See ibid*. ("This is not to say, however, that completion of a warrant check that extends the duration of a street stop is always reasonable. Indeed, the length of the delay impacts the reasonableness analysis."). *Hall* involved warrant checks that "typically delayed the stops by anywhere from four to seven minutes." *Id*. at 954. The Seventh Circuit held that such a delay was well within the bounds of objective reasonableness, adding that even a delay of "eleven [to] fifteen minutes

… is within the bounds of what this Court and our sister circuits have determined to be reasonable when officers have reasonable suspicion for the stop." *Ibid*. The delay for the warrant check here was only about a minute and a half—indisputably an acceptably brief delay. Officer Rivera discovered the gun during this period—*i.e.*, before Officer Sieber finished returning Watson's identification to his wallet. Thus, at the moment Rivera established reasonable suspicion for the second pat-down, Watson was still lawfully seized. There was no unlawful prolongation of the stop.

Watson retorts that the principle articulated in *Hall* applies only during a "consensual encounter" in which officers "do not convey a message that compliance with their request [for identification] is required." Doc. 124 at 8. Watson misreads *Hall*. Aside from the question whether officers may run a warrant check during a *Terry* stop, *Hall* also addressed whether "merely asking for identification" constitutes a Fourth Amendment seizure. *Hall*, 953 F.3d at 951-52. In the portion of the opinion invoked by Watson, the Seventh Circuit explained that "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual [and] ask to examine the individual's identification ... *as long as the police do not convey a message that compliance with their requests is required*." *Id*. at 951 (alteration in original) (emphasis added) (quoting *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991)). In other words, when an officer conveys that an individual must hand over his identification, that may turn the encounter into a Fourth Amendment seizure. But where, as here, there is *already* a seizure, there is no rule that demanding a suspect's identification renders unconstitutional an otherwise valid stop. Once there is a valid seizure, the question becomes whether the officers unreasonably prolonged the stop to ask for and run a check on the suspect's identification. For the reasons given, the officers did not do so here.

17

**Conclusion**

The court finds by a preponderance of the evidence that the officers had reasonable suspicion to perform an investigatory stop of Watson, that Officer Rivera had reasonable suspicion to perform the pat-down that led to the discovery of the gun in Watson's waistband, that there was no arrest requiring probable cause, and that the stop was not unreasonably prolonged. Because the officers did not violate Watson's Fourth Amendment rights, his motion to suppress evidence regarding the discovery of the gun on his person is denied. Watson's motion to suppress certain of his post-arrest statements to law enforcement is denied as moot.

August 2, 2021

_____
United States District Judge